IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

TANYA M. RIESBERG,

                    Plaintiff,                              8:18-CV-456

vs.

ANDREW M. SAUL,[1] Commissioner                MEMORANDUM AND ORDER
of Social Security,

                    Defendant.

Tanya Riesberg appeals from the denial, initially and upon reconsideration, of her application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq*. The Court has considered the parties' filings and the administrative record and finds that the Commissioner's decision was not supported by substantial evidence. Therefore, Riesberg's motion for reversal (filing 13) will be granted, the Commissioner's decision will be reversed, and the case remanded for calculation and award of benefits.

I. PROCEDURAL HISTORY

On February 3 2015, Riesberg applied for disability insurance benefits under Title II. T13. Her claim was denied initially and on reconsideration. T13 Following a hearing, the administrative law judge (ALJ) found that Riesberg was not disabled as defined under 42 U.S.C. §§ 216(i) or 223(d), and therefore not entitled to benefits under the Social Security Act. T25. The Appeals Council of the Social Security Administration denied Riesberg's request for review of

---

[1] Andrew M. Saul is now the Commissioner of Social Security and will be automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d).

the ALJ's decision. T1. Accordingly, Riesberg's complaint seeks review of the ALJ's decision as the final decision of the Commissioner under 42 U.S.C. § 405(g). Filing 1.

## II. FACTUAL BACKGROUND

At the time of hearing, Riesberg was 45 years old and lived with her boyfriend and adult daughter. T51; *see* T200. The record contains extensive evidence of Riesberg's years of treatment for pain, which the Court has thoroughly reviewed. To summarize, Riesberg suffers from painful peripheral neuropathy: a condition that develops slowly, over months or years, and often begins with sensory abnormalities in the lower extremities, including tingling, numbness, and burning pain. *See The Merck Manual of Diagnosis and Therapy*, 1518-20 (16th ed. 1992) [hereinafter "Merck"]; *see also Taber's Cyclopedic Medical Dictionary*, 1387, 1634 (19th ed. 2001) [hereinafter "Taber's"].

> Pain is often worse at night and may be aggravated by touching the affected area or by temperature changes. In severe cases, objective signs of sensory loss, typically with stocking-and-glove distribution, can be shown. The Achilles and other deep tendon reflexes are diminished or absent. . . . Sensory or proprioceptive deficits may lead to gait abnormalities.

Merck at 1520. Diabetes is a common cause of peripheral neuropathy. Merck at 1520; Taber's at 1387, 1634.

Riesberg also has degenerative disc disease, specifically in the lumbar spine, and is obese. T400-01. And Riesberg suffers from anxiety and depression

as a result of her pain and the untimely death of her husband in a motor vehicle accident. *See* T52, 309-10, 329-30.

### 1. WORK HISTORY

From 1999 until July 2014, Riesberg held positions working for her husband's flooring company, as a Certified Nursing Assistant (CNA), and as a title researcher. T37-44, 205. Being on her feet full time as a CNA aggravated her pain, so she sought a desk job. *See* T42-43. But Riesberg was terminated from desk jobs by two employers, Cox Cable and American Title, for absenteeism related to her pain. T42-43. She said it was just too difficult to focus. *Id.* After July 2014, Riesberg worked 4-5 hours per month for about a year booking direct sales parties for an online bag company. T37-41. That was the last time Riesberg worked in any capacity. T37.

### 2. MEDICAL HISTORY

Riesberg's pain in her low back and feet began in 2011. T42; *see also* T290, 298, 309. It is not clear from the administrative record when, and from whom, Riesberg first sought treatment.[2] But in January 2012, Riesberg had epidural steroid injections that provided relief for about 8 months, and then the pain came back more severely. T298; *see also* T309, 322, 332, 418.

In November of 2013, Riesberg saw Karen Staack, M.D. and requested a referral to a pain specialist for additional evaluation and treatment because the pain in both of her feet was "to the point where she [could] barely stand it." T298. Riesberg was interested in another opinion because a neurologist told her the pain was likely small fiber diabetic neuropathy, but that didn't make

---

[2] The oldest medical record contained in the administrative file is from November 13, 2013.

sense to her because the epidural injections had helped in 2012.[3] Staack noted "[s]he is crying while discussing this[;] very upset because symptoms are not improving," "she appears distressed," "[h]er affect is angry," and "she exhibits a depressed mood." T298. However, lab results confirmed that Riesberg had a Hemoglobin A1c level of 7.7—indicative of diabetes—and Staack diagnosed Riesberg with neuropathy and uncontrolled type 2 diabetes. T299, 301, 303. Staack opined that Riesberg's problems were caused primarily by smoking and excess weight and that "ultimately it is very unlikely we will be able to get this under control without serious lifestyle modifications." T299.

In January and February 2014, Riesberg saw Christopher Criscuolo, M.D., a pain specialist. She reported that she had been in pain for 3 years and it was "made worse by exercise and standing for long periods of time." T290. Riesberg said that hydrocodone "helped somewhat." T290. Criscuolo noted that Riesberg had "some lumbar and degenerative disc disease," and exhibited lumbar paravertebral tenderness. T290. Criscuolo also noted "stocking distribution dysesthesias," a sign of diabetic neuropathy. T290; *see* Merck at 1520. Initially, Criscuolo made several changes to Riesberg's medications, including anti-convulsants, topical pain cream and pain medication. T291. But when Riesberg came back in February, she complained that her pain symptoms were unstable—an average 6 out of 10—and not well controlled.[4] T292. Criscuolo noted "some lumbar paravertebral spasm," and increased neuropathic pain in her feet without signs of sympathetic dysfunction. T293.

---

[3] Even at the hearing Riesberg still felt she did not have an adequate explanation for her painful neuropathy, and she had seen a neurologist for further diagnosis and treatment. T45; *see also* T418, 415.

[4] All of Riesberg's subjective reports of pain level are on a 1 to 10 scale, where 1 is the lowest or slight pain, and 10 is the highest or worst pain.

He adjusted her anti-convulsant type and dosage and her pain medication. T293.

In June 2014, Riesberg returned to Dr. Staack for follow-up and swelling in her ankles. T300. At that time Staack did not observe any tenderness in Riesberg's feet, but noted edema and bilateral foot numbness. T300. Staack opined that the swelling was coming from "venuous stasis from obesity," but also recognized that the decreased sensation in Riesberg's feet was associated with uncontrolled type 2 diabetes. *See* T300-01. Staack ordered another Hemoglobin A1c test, which came back at 7.2—diabetic. T304-05.

Later in June 2014, Riesberg began seeing Patrick Cronican, M.D., the physician who treated Riesberg for the longest period in the records before the court.[5] *See* T309. (He did not, however, submit an opinion for purposes of disability.) According to Cronican's notes, on her first visit Riesberg reported chronic pain including numbness, tingling, burning, and hyperesthesia. T309. Riesberg also said that the gabapentin she was taking "only help[ed] partially and temporarily," and explained the injections she'd had in 2012 worked, but then wore off. T309. Riesberg said she was considering applying for disability. T309. Cronican observed Riesberg "seems tearful at times" and "appears depressed anxious and uncomfortable," but "does not appear in severe distress." T309. Cronican also noted "tenderness over her low back," and "moderate decreased range of motion of the back." T309. "After repeated requests," Cronican began prescribing Riesberg hydrocodone for the pain, and also started her on citalopram for her anxiety and depression. T310. Finally, Cronican, like Staack, suggested that Riesberg work on diet and exercise. T310.

---

[5] Riesberg saw Cronican for over two years—first on June 23, 2014 (T309) and last on October 14, 2016 (T423).

In July 2014, Riesberg followed-up with Cronican, reporting neuropathic pain and distress over the tragic death of her husband only a few days after her June visit. T310. Cronican noted that Riesberg "appears significantly depressed," and "rates her pain at a 7 or 8." T310. He again recorded tenderness in the lower extremities, but no edema and "no apparent neurologic deficits." T310. He refilled her gabapentin and told Riesberg to continue the hydrocodone and reschedule appointments she had missed with pain management and endocrinology following her husband's death. T311.

In September of 2014, Riesberg began seeing Griffith Evans, M.D., a board-certified pain specialist, who treated her for almost two years[6] and wrote a letter in support of her application for disability. *See* T427. Evans administered a series of two lumbar sympathetic injections in September and October 2014. *See* T358, 314.

At the end of September 2014, Riesberg returned to Dr. Cronican. She rated her pain at 10 and unchanged since her last visit. T311. He again noted tenderness across Riesberg's low back, and "mildly reduced range of motion in her back in all directions." T312. Cronican refilled her hydrocodone prescription and also recommended "twice daily therapeutic stretching, heat, massage[, and] exercise." T312.

Riesberg followed up with Cronican in January 2015, complaining of fatigue, paresthesia in her lower extremities, and pain at a 9. T313. She also expressed increased stress related to the trial of the man responsible for her husband's fatal motor vehicle accident. T313. Again, Cronican observed tenderness in Riesberg's lower back and pain in her lower extremities. T313.

---

[6] Riesberg first saw Evans on September 17, 2014, T314, 358, and for the last time (in the records before the Court) on June 28, 2016, T412.

Cronican refilled Riesberg's citalopram, hydrocodone, and metformin, which she had been taking for her diabetes. T314.

Dr. Evans saw Riesberg again in April 2015 and recorded that the lumbar sympathetic blocks he had authorized in 2014 "gave her partial relief for [a] short time." T358. Riesberg told Evans that her pain was "continuous and heavy," "throbbing, sharp, and shooting," and at best a 7. T358. That day Riesberg said her pain was a 10 and that nothing alleviated the pain. T358. Evans observed that Riesberg had a "normal gait and station," but "has allodynia and alteration to sensation of touch over both lateral ankles and feet." T359. Riesberg's straight leg raise test was negative bilaterally. T359. In his treatment plan, Evans expressed that Riesberg had "worsening painful diabetic neuropathy" that he believed was being treated with an "optimized" dose of anticonvulsants, yet still resulted in pain scores of 10. T360. Evans also noted that the pain "causes significant sleep disturbances," and recommended Riesberg try a spinal cord stimulator. T360.

Riesberg returned to see Dr. Cronican twice in May of 2015. On both occasions she rated her pain at a 9. T341, 342. Both times Cronican recorded tenderness and moderately reduced range of motion in her back. T341, 343. He also noted "pain and burning into her feet." T341. On the first visit, Cronican refilled Riesberg's hydrocodone and also recommended smoking cessation and weight loss strategies. T342. Later that month, Riesberg said she was taking phentermine and working on diet, exercise and weight loss, but wanted the phentermine refilled, and Cronican obliged. T342-43. She also reported she was taking Lyrica and thought it was helping partially, so Cronican prescribed that for her neuropathic pain. T342-43.

On May 26, 2015, Kimberly Vacek, Ph.D. performed a psychological evaluation of Riesberg to assess for risks associated with the trial spinal cord

stimulator surgery. T322. The evaluation contained a lengthy self-report by Riesberg that was generally consistent with her application for disability. *See* T240-44. Riesberg described the pain as "shocks in my feet," and said it "feels like my toes are breaking," "like a nail is being pounded in my arch," and "like my ankle has been hit with a sledgehammer." T322. She said on good days she could "do chores, cook, do laundry, etc," but that her pain was exacerbated by physical activity, being in one position for too long, being touched, barometric pressure changes, and stress. T322. She added that standing "feels best, but I pay for it later on." T322. Riesberg reported that her pain level was "always a 10," but when Vacek asked about good days she said it ranged from a low of 7 to a high of 10. T322. She also said she managed her pain by using a motorized cart when walking. T322. Riesberg "described her mood as irritable due to her pain," and explained she had "significant pain-related anxiety at night," "tearfulness when discussing her pain, frequent irritability, guilt ('I feel useless since I had to quit working.'), insomnia (sleeps 4 hours at most at a time), and hopelessness." T323. Riesberg said she tries to keep herself busy, but when the "pain is severe (which is often), she basically stays at home and spends time napping or switching positions to manage her pain." T323.

Vacek noted that Riesberg was alert, oriented, cooperative, and "answered all questions directly, logically, and sequentially." T324. She also observed that Riesberg was anxious, her "affect was congruent but restricted," and "[s]he bounced her knee throughout much of the interview." T324. Finally, Vacek noted "[s]he ambulated independently but slowly and with significant pain behavior." T324. Ultimately, Vacek concluded that Riesberg was an appropriate candidate for the trial spinal cord stimulator, but opined that she could benefit from therapy and pain coping skills. T324.

On June 9, 2015, Riesberg was scheduled to see a psychologist and physician to be evaluated for disability, but did not show up for either appointment. T325-26. Neither record indicates a reason for the no show. T325-26.

On July 6, 2015 Joshua Needelman, Ph.D. performed a psychological interview and report for the purpose of determining disability. *See* T327-29. Needelman noted that Riesberg drove herself to the appointment, was aware of the purpose of the interview, and easily established rapport. T327. Riesberg said she struggled with depression, anxiety, and hopelessness related to her pain, and rarely left the house. T328. Needelman observed that Riesberg's ability to concentrate was "fair but diminishing," that she "appeared neutral and friendly," but became tearful at times, and that her energy level "appear[ed] to be low." T328. Needelman opined that Riesberg could comply with simple instructions, relate well to coworkers and supervisors, adapt to changes in her environment, and manage her finances. T328-29. Ultimately, Needelman associated Riesberg's anxiety and depression with her physical health and said that as long as pain was present, the anxiety and depression likely would be as well. T329.

Elizabeth Dayton, D.O. performed a disability medical evaluation the same day. T332. The history Riesberg provided to Dayton was consistent with her prior medical records, except Riesberg said that the cause of her neuropathy was uncertain and that she had only recently been diagnosed as pre-diabetic. *See* T332. Dayton observed that Riesberg was in "no acute distress; however, very tearful throughout the entire exam." T335. Dayton also noted "trace edema in her bilateral lower extremities," and "decreased ankle dorsiflexion and plantar flexion" which appeared to be related to pain. T336. Dayton documented "very mild tenderness to palpation" in Riesberg's upper

thoracic and lumbar spine." T336. Dayton observed that Riesberg's feet were "extremely sensitive to touch and claimant pulls away in pain when feet are touched." T336. Riesberg also had a "very slow gait," was "not able to walk on her heels and toes," and was "able to rise from a seated position, but [was] very gentle when placing her feet on the ground." T336. Ultimately Dayton concluded that Riesberg's chronic pain "has affected her ability to be on her feet for a long time/stand for a long time," but that she did not have "significant limitations in her range of motion with her back." T337.

On July 28, 2015 Riesberg underwent surgery to insert a trial spinal cord stimulator. T361. On August 3, 2015, Riesberg followed up with Dr. Evans and reported that she had "good paresthesia coverage over all her painful areas throughout the trial," but only 25 percent pain relief. T365. Evans and Riesberg decided not to proceed with a permanent spinal cord stimulator due to the limited pain relief with the trial. T366. However, Evans documented that Riesberg noticed recurring "left buttock and posterior thigh pain on the left," and "had evidence of nerve root pain on straight leg raising, with pain distribution in an L5-S1 pattern." T366. Evans prescribed Cymbalta and ordered an MRI of Riesberg's lumbar spine. T366. An MRI was taken on August 14, 2015 and revealed a stable "small central disc protrusion at L5-S1," "facet degenerative changes of the lumbar spine," but "no central or foraminal stenosis." T353-54.

On August 17, 2015, Riesberg followed up with Dr. Cronican. Riesberg reported that she was "unable to exercise because to stand and walk is too painful," but would do some exercises in her parents' pool. T344. Riesberg also said that her feet "hurt badly" when laying down, sitting, and walking, and that standing was most comfortable, but that when she sat down she paid for it and her "knees really throb[bed]." T344. Cronican noted that Riesberg

appeared "depressed and anxious," and "seem[ed] to have decreased insight." T345. Cronican also observed tenderness across Riesberg's low back, and pain and hyperesthesia in her lower extremities. T345. Cronican refilled Riesberg's hydrocodone prescription and "discussed weight loss strategies including diet and exercise." T346-47. He also ordered another hemoglobin A1c test, which came back abnormal at a 5.8. T346, 352.

On August 19, 2015, Riesberg saw Dr. Evans to establish a treatment plan after the failed spinal cord stimulator. T362. He again noted that Riesberg received only 25 percent relief and that "[i]t was decided to try to maximize her medical regimen." T362. Evans wrote that Riesberg exhibited "decreased sensation over both feet in a stocking pattern starting at mid ankle," but that lower extremity reflexes and strength remained normal. T363. Evans increased Riesberg's dosage of Cymbalta and switched her from gabapentin, which he deemed to be failing, to Lyrica. T363.

Riesberg returned to Dr. Cronican on September 16, 2015 complaining of pain and urinary incontinence.[7] T381. He again noted pain across her low back and moderate reduced range of motion of her back in all directions. T382. Cronican prescribed phentermine to assist with weight loss and suggested Riesberg diet and "walk daily for 1 hour." T382.

On November 26, 2015, Dr. Cronican saw Riesberg for a sore throat and chronic pain. T383. Riesberg was requesting a refill of her hydrocodone, and reported taking about 180 tablets per month. T383. Cronican observed "pain and tenderness diffusely across low back with muscle spasm," as well as moderately reduced range of motion in all directions. T384. He further noted "hypersensitivity and pain venous stasis swelling in her lower extremities."

---

[7] Urinary incontinence can be a symptom of peripheral neuropathy, although it is unclear from the records whether Cronican thought Riesberg's was related. *See* T381; Merck at 1520.

T384. Cronican refilled her hydrocodone and again suggested Riesberg diet and "walk daily for 1 hour." T385.

Dr. Evans saw Riesberg in February 2016 to evaluate her increased foot pain. T408. During the visit, Riesberg rated her pain as an average 6 or 7, but said "in the last 3 weeks it is increased to 10," without any apparent cause. T408. He noted that Riesberg had "good range of motion and strength in both feet and ankles," and a normal gait and station. T410. He did, however, observe "some decreased sensation to touch over both feet," and said Riesberg complained of pain in "the soles and dorsum of both feet." Evans also observed Riesberg to be "in distress secondary to pain." T409-10. He said "[o]n today's visit she was tearful and said that she felt like she was running out of options." T411. Evans recommended "dorsal root ganglion stimulation" once approved, discussed possible ketamine infusions, and prescribed Horizant rather than gabapentin. T411. He also prescribed a new compound anti-inflammatory cream and a new pain medication, Nucynta, and instructed Riesberg to continue hydrocodone only as needed. T411.

Riesberg followed-up with Dr. Cronican on March 6, 2016 and requested a refill of her hydrocodone, as she rated her pain at a 9. T393. Cronican observed continued tenderness and reduced range of motion in her low back. T394. Cronican wrote "[s]he has burning tingling hyperesthesia in lower extremities," primarily in her feet. T394. Riesberg's hydrocodone prescription was refilled for 12 weeks, and she was given samples of extended release gabapentin. T394. Cronican also recommended Riesberg diet and "walk daily for 1 hour." T394.

At the end of May 2016, Riesberg saw Dr. Evans and complained of pain at a 9 to 10, which she described as "constant burning and shooting." T404. Evans noted that Riesberg appeared "in distress secondary to pain." T406.

Evans physical exam revealed "severe allodynia over the dorsum of both feet to just about the malleolus bilaterally[;] there is a decreased sensation to touch in a stocking-like pattern in both feet." T406. Evans also noted that Riesberg was "somewhat frustrated with her lack of progress in controlling her pain," and that she reported the pain increased with activity. T407. Evans scheduled additional lumbar sympathetic blocks despite "incomplete relief," and prescribed Horizant because Lyrica was not approved by Riesberg's insurance. T407; *see* T404. He also ordered a different compound pain cream for Riesberg to try. T407.

On June 5, 2016, Riesberg saw Dr. Cronican for chronic foot pain, fatigue, anxiety and depression. T395. He continued to note "tenderness and pain across low back," with moderately reduced range of motion in all directions. T396. Cronican switched Riesberg from hydrocodone to oxycodone, and continued to recommend dieting and walking 1 hour per day. T395.

On June 7, 2016, Dr. Evans performed a bilateral lumbar sympathetic block. T413. On June 20, 2016, Riesberg had a follow-up office visit with Evans to discuss the results and said she got "about 20-30% pain relief lasting a week and a half." T399. Evans noted "[t]his was significant for her."[8] T399. He also documented "decreased sensation to touch in a stocking like pattern" from the mid-ankle down, bilaterally, "patchy erythema in the ankles," and " allodynia over the anterior distal ankle and the dorsum of both feet." T401. Evans prescribed Horizant, which Riesberg seemed to be responding to better than

---

[8] Evans notes also suggest that Riesberg received about 40 percent pain relief from the trial spinal cord stimulator and that the main problem was that no paresthesia was obtained in the toes of either foot. T399. This is in conflict with Evans' July 2015 notes which described only 25 percent pain relief and "good paresthesia coverage over all her painful areas." *See* T365.

gabapentin, a repeat lumbar sympathetic block injection, and a third compound pain cream. T402; *see also* T412.

Riesberg saw Dr. Cronican for the last time on August 2, 2016 for the flu and chronic pain. T422. She told Cronican that her pain was getting worse in her lower extremities. T422. Cronican observed the same tenderness across her low back and reduced range of motion of her back in all directions. T423. He also noted "hyperesthesia of her lower extremities," and "some venous stasis and mild swelling." T423. Cronican refilled Riesberg's hydrocodone for three months and recommended she "try to walk daily for 1 hour." T423.

On October 14, 2016, Riesberg tried to speak with Cronican in an "unofficial manner," after she was terminated for multiple no-shows but nevertheless tried to schedule an appointment. T424. Cronican told her she could be seen, but not continue her care at that clinic. T424. Cronican noted that Riesberg was surprised and distressed and asked about where to look for a new provider. T424.

Riesberg began seeing Dr. William Fitzgibbons, M.D., on November 8, 2016. T418. The history Riesberg reported to Fitzgibbons was consistent with her other medical records. *See* T418. Fitzgibbons observed "[p]osition sense to the feet seem good. Sensation and light touch are normal without apparent hypersensitivity. Two point discrimination is equal. She has some decreased sensation to pin prick over the left great toe medial aspect." T418. He also noted "patient is more interested in the cause" of her pain, and that while her A1c's had been high in the past, the most recent "was in the 5's," and that lab tests seemed to be inconclusive thus far. T418. Fitzgibbons did not order medication because "it sound[ed] as though she ha[d] been tried on almost everything," and decided to obtain all her medical records to review. T418.

On January 11, 2017, Riesberg followed up with Fitzgibbons reporting

symptoms that were "not much different." T417. He ordered an A1c test, which came back at 6.6 (high). T417, 419. He also increased Riesberg's gabapentin and refilled her hydrocodone. T417.

On March 20, 2017, Dr. Fitzgibbons saw Riesberg for the last time before the administrative hearing. T415. Fitzgibbons noted "[s]he has exquisitely sensitive feet, particularly the forefeet and left more than right. This is to light touch. She finds that much more uncomfortable than pin prick. In fact, when I remove[d] her sock, she found it very painful." T415. He also observed "[t]wo point discrimination appears to be okay on both feet. She was able to detect vibration, except slightly decreased in the left forefoot. No changes that I can see in her feet." T415. Fitzgibbons expressed that he "would really like to get her into a neurologist to reassess her, although she has been to two in the past. . . . We will attempt to continue with surveillance to find a cause for this terrific problem." T415. He refilled her hydrocodone and prescribed phentermine to assist with weight loss "as she is so frustrated." T415. Riesberg did visit Ram Mohan Sankaraneni, MBBS on July 5, 2017. T431. She was told she would likely need a punch biopsy of the skin and autonomic testing to determine the type of neuropathy. T431.

### 3. OPINION LETTERS

In support of her application for disability, Riesberg submitted opinions from two treating physicians—Dr. Evans, T427, and Dr. Fitzgibbons, T429.

In a letter dated July 9, 2017, Dr. Evans expressed that Riesberg reported a pain score of 10 on her last visit, and that pain medication had not seemed to help much. T427. He therefore opined that Riesberg would have difficulty concentrating for long periods of time. T427. He also opined that frequent changing of positions can provide short-term distraction and mild relief for "patients like this." T427. "A constant high level of pain," of the type

Riesberg has, "is exhausting," he said. T427 He opined it would require frequent resting throughout the day and absences from work. T427. Finally, he said Riesberg "would not be able to consistently work an 8 hour day 5 days a week since July 1, 2014." T427.

Dr. Fitzgibbons wrote a letter dated July 11, 2017 describing Riesberg as "suffering from at this point uncharacterized peripheral neuropathy for as much as seven years." T429. He said the pain is "exacerbated by touch, pressure, movement and overall incapacitating." T429. Fitzgibbons opined that she could not be in one position, and particularly sitting for more than 25-30 minutes before needing to switch. T429. He also opined that she required rest and sleep during the day and would be forced to call in sick or leave early due to the "severity of the pain." T429.

### 4. Administrative Hearing

At the time of the administrative hearing on July 19, 2017, Riesberg testified more or less consistently with her medical records. T64. Riesberg said that she was not able to work because of the pain in her feet. T42. She said "I couldn't concentrate at work when I was in so much pain." T42. Riesberg also explained that while transitioning to a desk job helped initially that "the pain ha[d] just progressed so much through the years," and "even sitting down didn't help." T43. She testified that having an adjustable sit/stand desk was nice, but even that accommodation couldn't overcome her pain and inability to focus. T43. She said she also missed doctor appointments due to pain. T56.

When describing her pain, Riesberg testified that it gets worse with "walking," "just even daily chores at home," and "just going to the grocery store." T48. When asked how long she could stand, Riesberg testified "maybe 30 minutes," and reiterated "sometimes I don't even finish my shopping because I'm just in too much pain." T49. Riesberg also expressed limits on the

amount of time she could sit—"usually about 30 minutes to 45 minutes top[s]," before needing to change positions. T49 She testified that she has to lay down and nap every day because "[m]y pain wakes me up. I don't sleep. So I'm up and down, up and down all night." T49. Ultimately, she said the pain was "still a seven" with pain medications, and she knew they helped, "[b]ut not enough, . . . and I take them all." T47-48.

Riesberg testified that throughout her course of treatment she was hopeful that the doctors would help her and that she would improve. T44-45. She said she had "several different series of spine injections," the most recent of which she stopped before finishing because they "didn't improve anything." T46-47. She also testified that a trial spine stimulator "didn't help," and only provided "maybe about 20 percent" relief. T46-47. She explained that she was hoping to get a new kind of spine stimulator approved by her insurance company, but they had so far denied it as experimental. T46.

Riesberg said that she does have good days sometimes when she tries to "get things caught up[,] . . . but then I pay for it." T53. On a good day, she might be able to go to the grocery store, dust, or vacuum, but only for an hour at a time and "it wouldn't be continuous." T53-54. But good days don't come along often anymore. T54. More often she will try and "psych" herself to do things like fold laundry, but a "tiny bit of chores" puts her in pain. T48; *see* T52.

Regarding her mental health, Riesberg testified that "I get depressed because I want to be in society and work." T52 "When you're [sic] stay at home like I do, you feel like you have no meaning or purpose because you're not doing anything productive." T52. "Sometimes with the depression . . . I don't even want to do anything." T54.

In addition to testimony from Riesberg, the ALJ heard testimony from a vocational expert (VE). The ALJ presented the VE with a hypothetical

regarding whether an individual with some functional limits who is able to perform simple, sedentary work that did not involve operation of foot controls or exposure to sustained extreme temperatures, but could perform no more than occasional stooping, kneeling, crouching, or crawling, among other limitations, could perform any jobs in significant numbers in the national economy. T57-58. The VE opined that such a person could get work as a document preparer, addresser, and charge account clerk. T58-59.

The ALJ then asked the VE a second hypothetical: whether in addition to the limitations in hypothetical one, if an individual needed to stop working at will for about one minute every 30 minutes of the work day and do whatever necessary to increase comfort before returning to sedentary work, could that person still perform the jobs mentioned? T59. The VE opined that, in her experience and knowledge in the field of vocational rehabilitation, such an individual could still perform those jobs. T59-60.

Counsel for Riesberg then proposed two additional hypotheticals. First, whether in addition to the limitations in hypothetical one, if an individual would miss work three days per month due to their medical condition, could that person still perform the jobs previously listed? T59. The VE opined that, in her experience and knowledge, with this additional condition the person would be precluded from competitive employment. T60. Second, counsel asked whether in addition to the limitations in hypothetical one, if a person needed to lie down for a couple of hours each day due to pain and fatigue from lack of sleep and side effects from medication, could they still perform the jobs previously listed? T60. The VE opined that such a person would also be precluded from competitive employment. T60.

## III. SEQUENTIAL ANALYSIS AND ALJ FINDINGS

Riesberg claimed she was disabled as a result of nerve damage, chronic pain, anxiety, depression, and pre-diabetes, T64-65, and has been since July 1, 2014—the date she quit working and shortly after she began talking to her physicians about applying for disability. T13; *See* T44-45, 213, 309. To determine whether a claimant is entitled to disability benefits, the ALJ performs a five-step sequential analysis. 20 C.F.R. § 404.1520(a)(4).

### 1. STEP ONE

At the first step, the claimant has the burden to establish that she has not engaged in substantial gainful activity since her alleged disability onset date. *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006); 20 C.F.R. § 404.1520(a)(4)(i). If the claimant has engaged in substantial gainful activity, the claimant will be found not to be disabled; otherwise, the analysis proceeds to step two. *Gonzales*, 465 F.3d at 894; 20 C.F.R. § 404.1520(a)(4)(i).

In this case, the ALJ found that Riesberg had not engaged in substantial gainful activity since her alleged disability onset date of July 1, 2014. T15.

### 2. STEPS TWO AND THREE

At the second step, the claimant has the burden to prove she has a "medically determinable physical or mental impairment" or combination of impairments that is "severe[,]" 20 C.F.R. § 404.1520(a)(4)(ii), in that it "significantly limits [her] physical or mental ability to perform basic work activities." *Gonzales*, 465 F.3d at 894; *see also Kirby v. Astrue*, 500 F.3d 705, 707–08 (8th Cir. 2007). Next, "at the third step, [if] the claimant shows that [her] impairment meets or equals a presumptively disabling impairment listed in the regulations, the analysis stops and the claimant is automatically found disabled and is entitled to benefits." *Gonzales*, 465 F.3d at 894; 20 C.F.R. § 404.1520(a)(4)(iii). Otherwise, the analysis proceeds.

The ALJ found that Riesberg has the following severe impairments: complex regional pain syndrome, diabetes with peripheral neuropathy, degenerative disc disease, and obesity. T16. The ALJ also found that Riesberg had major depressive disorder and anxiety disorder, but that both were non-severe. T16. And the ALJ considered Riesberg's obesity "in combination with her other impairments." T17. Ultimately, the ALJ found that Riesberg's impairments, considered singly and in combination, did not meet or medically equal a presumptively disabling listed impairment. T16-17.

Accordingly, the ALJ proceeded to determining Riesberg's residual functional capacity.

### 3. RESIDUAL FUNCTIONAL CAPACITY

Before moving to step four, the ALJ must determine the claimant's residual functional capacity (RFC), which is used at steps four and five. 20 C.F.R. §§ 404.1520(a)(4), 404.1250(e). "'Residual functional capacity' is defined as 'the most [a claimant] can still do' despite the 'physical and mental limitations that affect what [the claimant] can do in a work setting' and is assessed based on all 'medically determinable impairments,' including those not found to be 'severe.'" *Gonzales*, 465 F.3d at 894 n.3 (quoting 20 C.F.R. §§ 404.1545 and 416.945).

The ALJ first considers whether the claimant suffers from "medically determinable impairment(s) that could reasonably be expected to produce [the claimant's] symptoms." 20 C.F.R. § 404.1529(a) to (c)(1). A medically determinable impairment must be demonstrated by medical signs or laboratory evidence. 20 C.F.R. § 404.1529(b). If this step is satisfied, the ALJ then evaluates the intensity and persistence of the claimant's symptoms to determine how they limit the claimant's ability to work. 20 C.F.R. § 404.1529(c)(1). This again requires the ALJ to review all available evidence,

including statements by the claimant, "objective medical evidence,"[9] and "other evidence."[10] 20 C.F.R. § 404.1529(c)(1) to (3). The ALJ then considers the claimant's statements about the intensity, persistence, and limiting effects of her symptoms, and evaluates them in relation to the objective medical evidence and other evidence. § 404.1529(c)(4). Ultimately, symptoms will be determined to diminish the claimant's capacity for basic work activities, and thus impact the claimant's RFC, "to the extent that [the claimant's] alleged functional limitations and restrictions due to symptoms . . . can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Id.*; § 404.1529(d)(4). Because the ALJ's RFC finding is the critical issue in this appeal, the Court will examine the ALJ's underlying reasoning in more detail.

The ALJ found that although Riesberg's impairments could reasonably be expected to produce her symptoms, Riesberg's statements "concerning the intensity, persistence and limiting effects" were not "entirely consistent with the medical evidence and other evidence." T18. The ALJ concluded that Riesberg's diabetes with peripheral neuropathy, degenerative disc disease, complex regional pain syndrome, and obesity would limit Riesberg to performing sedentary work, postural activities only occasionally, and prevent operation of foot controls. T21. He also limited Riesberg to simple work due to her claims of difficulty concentrating. T20. But, the ALJ reasoned, Riesberg's severe conditions could be accommodated by the ability to stop working at will for one minute every 30 minutes of the workday. T21.

---

[9] 20 C.F.R. §§ 404.1529(c)(2) and 404.1502(c), (f), & (g).

[10] "Other evidence" includes information provided by the claimant, treating and non-treating sources, and other persons. *See* 20 C.F.R. § 404.1529(a) (and sections referred to therein); *see also* 20 C.F.R. § 404.1529(c)(3).

The ALJ gave only some weight to the opinion of Dr. Evans because his opinion was rendered in July 2017, 13 months after he had last seen Riesberg. T21. The ALJ also discounted Evans' opinion due to purported inconsistencies. First, while Evans opined that Riesberg would have difficulty concentrating, his notes never reflected that she was "confused, inattentive, or not listening." T21. Second, the ALJ cast doubt on Evans' opinion that Riesberg would be exhausted by the pain and thus miss work because it was "speculative," and she never missed appointments with Evans or appeared exhausted. T21. Finally, the ALJ dismissed Evans' opinion that Riesberg could not work 8 hours a day five days a week, because such an opinion was "reserved to the Commissioner." T21.

The ALJ gave little weight to the opinion of Dr. Fitzgibbons for similar reasons. T21-22. He pointed to a lack of evidence that Riesberg missed appointments, and suggested that Fitzgibbons' opinions were purely speculative. T22. The ALJ also reasoned that Fitzgibbons' opinions regarding Riesberg's ability to attend work on a full time basis were not medical opinions, and were therefore reserved to the Commissioner. T22.

The ALJ also found Riesberg's subjective reports of relief from treatment inconsistent with other evidence of record. T19. The ALJ relied on Dr. Dayton, the consulting physician, who observed that Riesberg's feet were "extremely sensitive to touch," which he found inconsistent with Riesberg's testimony that she could stand for 30 minutes at a time and drive. T19. The ALJ also pointed to notes from treating physicians who had observed a lack of hypersensitivity to touch and decreased sensation to pin prick, and who had encouraged Riesberg to walk for an hour each day. T20.

The ALJ also suggested that Riesberg's statements regarding daily activities had been inconsistent. T20. For example, her estimate of the time

she could be on her feet in March 2015 (could walk half a block) and July 2017 (could be on her feet for 30 minutes) were different. T20. Similarly, in March 2015 she said she could drive for an hour comfortably, but denied such ability in July 2017. T20. The ALJ stated that Riesberg could "go grocery shopping, drive, prepare meals, and do some household chores, such as dusting and vacuuming," and on a good day could do chores for an hour before needing a break. T20. Finally, the ALJ noted that at the hearing Riesberg "did not show any of the behavior one would expect from someone experiencing such oppressive symptoms." T20.

Riesberg's claims of decreased concentration were also unsupported, according to the ALJ. T20. He reasoned that during her May 2015 psych evaluation Riesberg claimed her pain was a 10, but that Vacek observed no impact on her ability to concentrate. T20. Furthermore, the ALJ pointed to Riesberg's ability to give detailed and specific descriptions of her medication dosages during the hearing. T20. Nevertheless, the ALJ included a limitation to performing simple work despite the perceived inconsistencies. T20.

The ALJ gave some weight to the opinions of the agency medical consultants who reviewed Riesberg's file at the initial and reconsideration stages. T22. The ALJ reasoned that the two medical opinions were consistent with each other and other substantial evidence of record. T22. He only varied his RFC determination from their opinions, to include more limits on postural activities and the ability to take 1 minute breaks, because of hearing testimony and the opinion provided by Dr. Evans. T22. Similarly, the ALJ reasoned that the two psychological opinions were consistent with one another and indicated that Riesberg's mental health conditions were related to her physical health conditions. T22. The ALJ varied from their opinion that Riesberg's anxiety and depression were severe because evidence not available to the consultants

indicated that both conditions were being treated conservatively with medication and without therapy. T22.

The ALJ gave great weight to the consultative opinion of Dr. Needelman, who concluded that Riesberg's limitations "were due to her physical impairments, rather than mental impairments." T23. The ALJ stated that Needelman's conclusion that Riesberg would be limited to simple work due to some difficulty concentrating was reflected in the RFC. T23.

The ALJ gave little weight to Dr. Vacek's psychological evaluation because it was conducted for the limited purpose of assessing risk prior to the spinal cord stimulator surgery. T23. But he noted that Vacek's opinion was consistent with the finding that Riesberg did not have a severe mental impairment. Accordingly, the ALJ found the following RFC:

> the residual functional capacity to perform sedentary work . . . except that she is able to stoop, kneel, crouch, and crawl only occasionally. She is able to perform work that does not expose her to sustained and concentrated extreme temperatures. She is able to perform work that does not require the operation of foot controls. She is able to perform work that is simple, and she is able to respond appropriately to routine changes in the work environment. She is able to perform work that allows her to stop working at will for one minute every 30 minutes of the workday.

T17.

### 4. STEPS FOUR AND FIVE

At step four, the claimant has the burden to prove that she lacks the RFC to perform her past relevant work. *Gonzales*, 465 F.3d at 894; 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1250(f). If the claimant can still do her past relevant

- 24 -

work, she will be found to be not disabled, otherwise, the analysis proceeds to step five. At step five, the burden shifts to the Commissioner to prove, considering the claimant's RFC, age, education, and work experience, that there are other jobs in the national economy that the claimant can perform. *Gonzales*, 465 F.3d at 894; 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g).

Here, the ALJ determined Riesberg was unable to perform past relevant work. T23. And at step five, the ALJ found that Riesberg could perform jobs that existed in significant numbers in the national economy, based on the testimony of the VE. T24-34. So, the ALJ found Riesberg was not disabled, and denied her claims for benefits. T25.

## IV. STANDARD OF REVIEW

The Court reviews a denial of benefits by the Commissioner to determine whether the denial is supported by substantial evidence on the record as a whole. *Teague v. Astrue*, 638 F.3d 611, 614 (8th Cir. 2011) (citing 42 U.S.C. § 405(g)). Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion. *Id*. The Court must consider evidence that both supports and detracts from the ALJ's decision, and will not reverse an administrative decision simply because some evidence may support the opposite conclusion. *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011). If, after reviewing the record, the Court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the Court must affirm the ALJ's decision. *Id*. The Court reviews for substance over form: an arguable deficiency in opinion-writing technique does not require the Court to set aside an administrative finding when that deficiency had no bearing on the outcome. *Buckner v. Astrue*, 646 F.3d 549, 559 (8th Cir. 2011). And the Court defers to the ALJ's determinations regarding the credibility of testimony, so long as they are

supported by good reasons and substantial evidence. *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011)

## V. DISCUSSION

Riesberg assigns two errors to the ALJ's decision: (1) failing to provide good reasons for the weight afforded Dr. Evans' and Dr. Fitzgibbons' opinions and for discrediting Riesberg's subjective complaints, and (2) failing to provide adequate available jobs at Step 5 because of a conflict between the RFC and the reasoning level 3 requirements of two of the positions. Filing 20. Riesberg also contends that the ALJ's appointment was unconstitutional and requires this court to remand her claim to be heard by a constitutionally appointed ALJ. Filing 14.

The Court agrees with Riesberg that the ALJ did not give sufficient reasons for the weight afforded Dr. Evans' and Dr. Fitzgibbons' opinions and Riesberg's own subjective account. The Court also finds that the ALJ's RFC determination was not supported by substantial evidence in the record.

The opinion of a treating medical source is given more weight because those sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of the claimant's impairments and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. 20 C.F.R. § 404.1527(c)(2). When the treating physician's opinion is supported by proper medical testing, and is not inconsistent with other substantial evidence in the record, the ALJ must give the opinion controlling weight. *See id.*; *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012). An ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating

physician renders inconsistent opinions that undermine the credibility of such opinions. *Anderson*, 696 F.3d at 793; *Davidson v. Astrue*, 578 F.3d 838, 843 (8th Cir. 2009).

Even if the treating source's opinion is not given controlling weight, an ALJ must apply certain factors—the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source—in determining what weight to give the opinion. *See* 20 C.F.R. 404.1527(c)(2); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). And the ALJ must *always* give good reasons for the weight given the treating source's opinion. 20 C.F.R. § 404.1527(c)(2); *see also Anderson*, 696 F.3d at 793. The ALJ may not, however, simply draw his own inferences about plaintiff's functional ability from medical reports. *Combs v. Berryhill*, 878 F.3d 642, 646 (8th Cir. 2017).

There is no dispute among the parties that Dr. Evans was a treating source whose opinion was entitled to deference. *See* 20 C.F.R. § 404.1502. Evans is also a board certified pain specialist who is entitled to special deference in his area of specialty. 20 C.F.R. § 404.1527; *see also Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998). The ALJ took issue with Dr. Evans' opinion for two main reasons: (1) Evans had not seen Riesberg for over a year when writing the opinion and (2) Evans had never documented fatigue, inability to concentrate, or missed appointments to support his opinion. T21, *see* T427. The Court recognizes that it is permissible for an ALJ to discount an opinion of a treating source that is inconsistent with the source's clinical treatment notes. *Anderson*, 696 F.3d at 793; *Davidson*, 578 F.3d at 843. But the Court cannot accept the ALJ's reasoning that Evans' opinion is at odds with his treatment notes or the other evidence of record.

The ALJ does not point to things *in* Evans' notes that are inconsistent with his opinion, but rather what is *not* there—any note of inability to concentrate or exhaustion. But that doesn't accurately characterize Evans' records. Evans' objective notes do generally report that Riesberg was not distressed, disoriented or lethargic. *See* T359, 366, 362-63, 401. However, in February 2016, after over a year of treatment with very little relief, Evans documented that Riesberg's pain had recently increased from an average 6 or 7 to a 10 and she was "in distress secondary to pain," "anxious," and "tearful" because "she felt like she was running out of options." T410-11. In May of 2016, Evans again observed that Riesberg was in distress from pain and "frustrated with her lack of progress in controlling her pain." T406-07. Evans' records also reflect Riesberg's complaints of decreased energy, fatigue, and sleep disturbance, including night sweats. *See* T358, 360, 405, 400.

In other words, Evans did not issue an opinion that directly conflicted with notes taken at or around the same time. *See Davidson*, 578 F.3d at 843; *Prosch v. Apfel*, 201 F.3d 1010, 1013, (8th Cir. 2000). For example, Evans did not consistently note Riesberg's pain level at a 5 and then suggest in his opinion that it was more severe. In addition, Evans' notes consistently document that Riesberg's pain was getting worse, and was generally unresponsive to treatment. Therefore, the Court doesn't see the supposed inconsistencies with Evans' eventual opinion that Riesberg would be exhausted and unable to sustain concentration for long periods as a result of her severe pain.

The ALJ also took issue with the fact that Riesberg never missed appointments with Evans. But the Commissioner, in this instance, is putting Riesberg in a Catch-22. In the administrative proceeding, the ALJ discounted Evans opinion, but on appeal, the Commissioner suggests that the Court

should not assume other appointments Riesberg missed, with Dr. Cronican, were missed because of pain. *See* filing 19 at 10. And in other cases, missed appointments and failure to follow treatment recommendations have been used *against* a claimant to show a *lack* of disability. *See Bernard v. Colvin,* 774 F.3d 482, 487 (8th Cir. 2014).

The Court refuses to engage in such mental gymnastics for the Commissioner's benefit. The Court is not convinced that Riesberg's attendance of her appointments with Dr. Evans provides a good reason to *discount* Evans' opinion. In fact, it makes sense that Riesberg would prioritize appointments with her treating physicians despite debilitating pain, because she wanted relief from that pain.

Medical testing and other substantial evidence of record also supports Evans' opinion. Evans himself documented evidence of Riesberg's diabetic neuropathy, degenerative disc disease, and complex regional pain syndrome. *See* T353, 358-366, 401-410. Evans also tried numerous treatments with limited or no success, including: anti-convulsants, pain relievers, three different topical compound pain relievers, a trial spinal cord stimulator, and lumbar sympathetic blocks. *See* T360-66, 402-11. And every physician that Riesberg saw from 2013 to 2017 diagnosed her with neuropathy; many associated it with her diabetes. T301, 293, 311, 360, 337, 415. Her A1c level was also consistently abnormal. It fluctuated between a high of 7.7 in November 2013 and low of 5.8 in August of 2015, but most recently tested at 6.6 in January 2017. The ALJ suggests that these levels are "under control," but the ALJ did not cite medical evidence for that suggestion, and the Court can find no such evidence in the record. *See* T19.

Finally, Riesberg's medical records as a whole support that Riesberg was in distress secondary to her pain. Dating back to Dr. Staack in 2013, records

show that Riesberg would become tearful, anxious and frustrated when discussing her pain with providers. *See* T298-99. Dr. Cronican noted on their first visit that Riesberg seemed "depressed, anxious and uncomfortable," although not "in severe distress," T309-10, and consistently made similar observations afterwards, even though her mood sometimes improved. *See* T309-14, 342-47, 381-85, 393-96. In addition, both of the state agency consultants, Dr. Needelman and Dr. Dayton, noted that Riesberg appeared "tearful," T328, 335, and Needelman also said her "energy level appears to be low." T328, 335. A claimant need not be in a constant state of outward distress to prove debilitating pain. *See Miller v. Sullivan*, 953 F.2d 417, 422-23 (8th Cir. 1992). The Court also finds the evidence consistent with Riesberg's claim that she has good and bad days.

The ALJ also discounted Riesberg's subjective claims of her pain's intensity, persistence and limiting effects because, according to the ALJ, they conflicted with objective medical evidence and were not entirely consistent. And the ALJ relied on Riesberg's supposed lack of credibility to assign limited weight to Evans' and Fitzgibbons' opinions because they rely, in part, on Riesberg's subjective complaints. Neither conclusion is persuasive.

First, the Commissioner points to evidence that while Riesberg had severe allodynia and decreased sensation in a stocking pattern on both feet, she also had full muscle strength, intact deep tendon reflexes, and an overall normal gait and station. T19. However, while peripheral neuropathy may result in decreased strength or reduced tendon reflexes, not all patients with disabling pain will produce those symptoms. *See* Merck at 1520. Therefore, the ALJ may not discount Riesberg's subjective account simply because she does not have such symptoms. *See Miller*, 953 F.2d at 422-23.

Second, the ALJ suggested that the 2015 MRI of Riesberg's lumbar spine revealed only a stable small disc protrusion and facet degeneration of the lumbar spine, without stenosis. T19. The ALJ concluded that this was consistent with Cronican's observations of tenderness and moderate reduced range of motion. T19. However, while the Court agrees that this evidence suggests Riesberg's degenerative disc disease may not be extreme, it does not support the conclusion that Riesberg is exaggerating her pain. Rather, the MRI supports her treating physicians' overwhelming diagnosis of peripheral neuropathy instead of radiculopathy. It also explains, in part, why lumbar sympathetic blocks helped only initially and partially and why Riesberg's physicians continued to look for a cause, including referring her to a new neurologist. *See* T399-402, 415-19.

Third, the ALJ suggested that Riesberg received "generally conservative treatment for her conditions." T19. But that finding is also unsupported by the record. Riesberg tried injections, which the ALJ admitted provided only partial and temporary relief. She tried a spinal cord stimulator, and the ALJ seemed to suggest that because she did not move forward with permanent placement that she is not credible. And the ALJ pointed out that the dorsal root ganglion spinal stimulator hadn't been tried, but concluded that was only because Riesberg's insurance denied it as experimental. Finally, the ALJ said that medication had been prescribed including gabapentin and hydrocodone. But he did not adequately credit the multitude of medication adjustments in both type and quantity that Riesberg's treating physicians tried. It is difficult to see how that treatment can be described as "generally conservative." *See* 20 C.F.R. § 404.1529(c); SSR 16-3P, 2017 WL 5180304 at *9 (Oct. 25, 2017). And it is hardly fair to fault Riesberg for her insurance company's denial of the new type of spinal cord stimulator.

Fourth, the ALJ said that Riesberg's claims of hypersensitivity in her feet were inconsistent with objective evidence of reduced sensation in her feet and her subjective reports that she can walk and drive. The ALJ relied on Dr. Dayton's exam, which showed hypersensitivity, and Dr. Fitzgibbons' initial exam which showed no apparent hypersensitivity and decreased sensation to pin prick. T20. However, Fitzgibbons later examined Riesberg and noted that she was actually much more sensitive to touch than to pin prick. And peripheral neuropathy results in sensory abnormalities such that a patient may experience both pain aggravated by touch and numbness. Merck at 1520. Furthermore, Dr. Cronican's recommendation that she "try to walk for 1 hour per day," is not inconsistent with her claims that she cannot be on her feet for that long at one time. Taken in context, that recommendation was clearly meant to encourage Riesberg to lose weight rather than an opinion about whether Riesberg could walk for a sustained 1-hour period. *See* T381-85, 393-96, 422-23. After all, it's entirely possible to walk for an a hour a day without walking for an hour at a time.

Fifth, the ALJ took issue with Riesberg's reports of daily activities and symptoms. However, when doing so he pointed to instances where Riesberg's account of the severity of pain *increased* and her ability to drive *decreased* from her original reports in March 2015 to the hearing in July 2017. T20. That is entirely consistent with her diagnoses and her medical records, which document complaints of increasing pain.[11] The ALJ also said that because Riesberg testified that she could still go grocery shopping, do some chores, and drive, that she remained capable of performing sedentary work. T20. But "the ability to perform these limited activities (with difficulty) on [her] good days is

---

[11] The Court, in fact, would expect her subjective accounts of pain and limits to daily activities to have changed over a two-year period where she was getting little relief from her treatment.

not inconsistent with testimony that on [her] bad days, [s]he cannot function at all." *Ross v. Apfel*, 218 F.3d 844, 849 (8th Cir. 2000).

Finally, the ALJ said that at the hearing Riesberg did not show any behavior that "one would expect from someone experiencing such oppressive symptoms." T20. But this type of reasoning has been squarely rejected by the Eighth Circuit—while the demeanor of a claimant may be noticed by the ALJ, her credibility may not be discounted on account of a failure to "sit and squirm." *Miller*, 953 F.2d at 422.

The ALJ simply did not provide good reasons to discount Riesberg's subjective statements regarding the severity of her pain. An ALJ may discount a claimant's subjective complaints of pain only if there are inconsistencies in the record as a whole. *Ellis v. Barnhart*, 392 F.3d 988, 996 (8th Cir. 2005). As explained above, the inconsistencies relied upon by the ALJ simply don't pass muster. There is substantial objective medical evidence to establish that Riesberg was suffering from severe painful peripheral neuropathy. And Riesberg was very consistent in complaining of pain that ranged from a low of 6 or 7 to a high of 10 throughout her treatment—treatment that was largely unsuccessful, aside from pain medication that barely took the edge off.

Having concluded that the ALJ did not have good reasons to discount Riesberg's subjective complaints, to the extent that Evans relied on those complaints to form his opinion, he was justified in doing so. In addition, it was appropriate for Evans to opine that Riesberg could not work consistently, 8 hours per day 5 days a week. In fact, medical opinions on how much work a claimant can do are not only allowed, but encouraged. 20 C.F.R. § 404.1527; s*ee Kelley*, 133 F.3d at 589. And just because over a year had elapsed since

Evans' last visit with Riesberg, his opinion is still entitled to deference.[12] First, there is no evidence in the record that her condition improved. Second, Riesberg should not be punished for seeking treatment from a different physician when she was still not getting relief. Dr. Fitzgibbons' notes even reflect Riesberg's frustration at the lack of confirmed cause for her pain and a desire to get help finding one. Therefore, Evans' opinion was entitled to at least substantial, if not controlling weight. *See Anderson*, 696 F.3d at 793.

The ALJ also gave Dr. Fitzgibbons' opinion little weight, justifying his decision by saying that Fitzgibbons relied on Riesberg's subjective accounts and only opined to things reserved for the commissioner. *See* T21-22. For the reasons outlined above, that reasoning is no more persuasive for Fitzgibbons' opinion than it was for Evans'. Fitzgibbons opined that Riesberg's peripheral neuropathy resulted in pain that is "incapacitating," and that would require her to change positions frequently, rest or nap, and result in her calling in sick to work or having to leave early. As previously mentioned, these types of opinions are not only acceptable from a treating source, but encouraged. *See* § 404.1527; *Kelley*, 133 F.3d at 589. Therefore, the ALJ should have afforded Dr. Fitzgibbons' opinion at least substantial weight. *See Papesh v. Colvin*, 786 F.3d 1126, 1132 (8th Cir. 2015)

Nor is the Court convinced by the ALJ's decision to adopt the opinions of the state agency medical consultants over the opinions of Dr. Evans and Dr. Fitzgibbons. The ALJ reasoned that the two consultants, who never examined Riesberg, were "familiar with the definitions and standards" used by the SSA

---

[12] In fact, there seems to be some justification for Riesberg not returning to Evans in that period—he believed she would be best treated by the dorsal ganglion nerve root stimulator that they had tried to get approved, but that had been denied by Riesberg's insurance as too experimental. *See* T46, 427.

and their opinions were consistent with one another and the other substantial evidence of record. For the reasons listed above, the Court disagrees. The opinions of non-treating practitioners who attempt to evaluate a claimant without examination do not ordinarily constitute substantial evidence upon which to base a denial of benefits. *Shontos v. Barnhart*, 328 F.3d 418, 427 (8th Cir. 2003). The Court finds very little, let alone substantial, evidence to support the consulting physicians' and the ALJ's own opinion that Riesberg is capable of sitting 8 hours a day, 5 days a week and managing her pain by simply moving for 1 minute every 30 minutes.

The ALJ should have afforded controlling weight to the opinion of Dr. Evans and at least substantial weight to the opinion of Dr. Fitzgibbons. The ALJ overlooked the bulk of the medical records in favor of impermissibly making his own inferences from what was *not* there. *See Combs*, 878 F.3d at 646; *Shontos*, 328 F.3d at 426-27. Evans' opinion, in particular, is a clear example of a treating physician who is "most able to provide a detailed, longitudinal picture" of Riesberg's medical impairments and brought "a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations." *See* § 404.1527(c)(2).

Having reached that conclusion, it is unnecessary for the Court to discuss Riesberg's other assigned error. In addition, according to the VE, someone with Riesberg's impairments who would also miss work three or more times each month and have to rest frequently at work would not be able to find competitive employment. T59-60. Had the ALJ given Dr. Evans' and Fitzgibbons' opinions appropriate weight, Riesberg would have been found disabled at step five and awarded benefits because there are not a significant number of jobs in the national economy that Riesberg can perform. *See*

*Gonzales*, 465 F.3d at 894; 20 C.F.R. § 404.1520(a)(4)(v). The Court will therefore reverse the Commissioner's decision and remand for an award of benefits. *See Shontos*, 328 F.3d at 427.

APPOINTMENTS CLAUSE

The plaintiff raises for the first time on appeal a claim that the ALJ was an inferior officer who, pursuant to *Lucia v. SEC*, 138 S. Ct. 2044 (2018), required appointment by the President, Courts of Law, or the Commissioner. Consistent with *Lucia,* the plaintiff asks that this matter be remanded and that a different ALJ be assigned to determine her claim for benefits. In response, the Commissioner argues that the plaintiff waived or forfeited any Appointments Clause claim by not timely raising the issue at the hearing before the ALJ or to the Appeals Council. Filing 19 at 18. Because the Court is reversing and remanding the Commissioner's decision on other grounds, it need not reach the constitutional question, as it is moot.

IT IS ORDERED:

1. The Clerk of the Court is directed to substitute Acting Commissioner of Social Security Andrew M. Saul as the defendant.

2. Riesberg's motion for an order reversing the Commissioner's final decision (filing 13) is granted.

3. The Commissioner's motion for an order affirming the Commissioner's final decision (filing 18) is denied.

4.   This matter is remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for calculation and award of benefits.

5.   A separate judgment will be entered.

Dated this 26th day of November, 2019.

BY THE COURT:

John M. Gerrard
Chief United States District Judge